

FILED

SEP 0 5 2014

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | \* | CR. 13-40139 |
| Plaintiff, | \* | |
| vs. | \* | REPORT and RECOMMENDATION |
| CODY MICHAEL SMITH, | \* | |
| Defendant. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Pending is Defendant's Motion to Suppress Evidence (Doc. 31).  A hearing was held on Tuesday, August 19, 2014.  Defendant was personally present and represented by his attorney of record, Assistant Federal Public Defender Jason Tupman.  The Government was represented by Special Assistant United States Attorney Jennifer Mammenga.  Three witnesses testified at the hearing.  Six exhibits were received into evidence.  Both parties have submitted briefs and oral argument was heard at the conclusion of the hearing.  Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## RECOMMENDATION

It is respectfully recommended that Defendant's Motion to Suppress be DENIED.

## JURISDICTION

Defendant is charged in an Indictment with Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. § 922(g)(9).  The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Schreier's Standing Order dated March 18, 2010.

## FACTUAL BACKGROUND

Three witnesses testified during the hearing. Their testimony, along with pertinent information from the Exhibits received into evidence, is summarized below:

**Sioux Falls Police Officer Ryan Sandgren**

Officer Sandgren was on duty on April 26, 2013.  He received a check well-being call

regarding Alexis Wallace who resided at Changes and Choices half way house. The caller (Jennifer[1] from Changes and Choices) believed Wallace was being held against her will by her boyfriend, the Defendant (Cody Smith). Jennifer believed there was a no-contact or protection order in place and that Smith was a controlling person and a drug user. As a part of her probation, Wallace was not supposed to have contact with Smith.

Sandgren and other officers went to Smith's apartment at 1021 S. 1st Avenue # 1 to check on Wallace. Sandgren had prior knowledge of that address and that there had been weapons fired, but he could not remember the name of the person with whom he dealt when he was previously at the apartment. The officers knocked on the door and talked with Smith. Smith said he had not had contact with Wallace for weeks and that he was alone in the apartment. Smith denied the officers access to his apartment, and denied their request to search the apartment for Wallace.

The officers retreated to their patrol cars and discussed what to do next. They could still see the apartment and re-contacted the reporting party (Jennifer). Metro communications advised that there was a warrant for Smith's arrest. The reporting party confirmed she knew Wallace was with Smith because she saw Wallace get into his car.[2] Wallace told Jennifer she needed to get her property from Smith's house or it would be destroyed. The officers watched the apartment until Smith emerged to take his trash out. The officers arrested Smith on his outstanding warrants. The

---

[1]Jennifer was a fellow resident at the halfway house.

[2]This was Sandgren's testimony, but he conceded the DVD (EX B) which contains the recordings of the various officers' body microphones of the incident would more accurately portray the encounter as it unfolded.

Officer Van Ravenswaay testified he did not recall Jennifer told the officers Wallace got into Smith's vehicle and did not recall any of the law enforcement officers knew about Wallace getting into Smith's car before they entered Smith's residence. The recordings reveal Wallace told the officers she'd gotten into Smith's car. Wallace told the officers that detail when she was being interviewed, *after* she was safely outside Smith's residence. EX B.

2

officers saw the curtains in Smith's apartment move, and saw someone look out the window. They knocked and announced "police." Nobody said anything. They entered and found Wallace in the bedroom. She was upset and crying. She indicated Smith had not let her leave. Sandgren admitted that when the officers found Wallace in the house, she was not restrained. She indicated the only reason she had not left the house earlier was because Smith would not let her leave. Although she probably could have seen that Smith was in the patrol car, she had not yet left the house.

When the officers entered the apartment, they saw drugs and drug paraphernalia. They also saw an AK-47 in the bedroom, partially covered by a sheet. In the meantime Jennifer called dispatch to report that Wallace had finally texted someone at the halfway house,[3] indicating Smith had not let her leave. Sandgren did not know of that call, however, until after the officers had entered the apartment.

### Sioux Falls Police Officer Trent Van Ravenswaay

On April 26, 2013 Van Ravenswaay was a Sioux Falls Police officer. He responded to a call at 1021 S. 1st Avenue. They received a call from Jennifer at a halfway house who reported her friend (Alexis Wallace) had gone to her boyfriend's (Smith's) house to retrieve her property and had not returned.[4] Wallace told Jennifer she would be back in a half hour but many hours had passed, so Jennifer was worried. They asked Smith if Wallace was there but Smith claimed she was not. Smith had outstanding warrants. They waited till he left the house to take the trash out, and arrested

---

[3]Until this text from Wallace, calls and texts to her had gone unanswered. The DVD indicates the officers arrested Smith at 20:14 (8:14 p.m.), and entered the apartment at 20:18 (8:18 p.m.). Jennifer called dispatch back at 20:25 (8:25 p.m.) and dispatch notified the officers of the text from Wallace to her halfway house comrades at 20:26 (8:26 p.m.). It is unclear, however, exactly what time Wallace actually sent the text. *See also*, EX C.

[4]The reporting party (Jennifer) voiced concern to the officers that Wallace was being held against her will by Smith because Wallace told her fellow halfway house residents she would return by 5:00 p.m. but had not returned. On the DVD (EX B) Officer Van Ravenswaay is heard re-contacting Jennifer to get more information. Sandgren knocks on the door to Smith's apartment. After Sandgren's talk with Smith and Van Ravenswaay's talk with Jennifer, the two officers reconvened to share information. Van Ravenswaay reported Jennifer overheard a phone conversation earlier in the afternoon between Wallace and Smith and knew Wallace intended to go to Smith's apartment to retrieve her belongings. Wallace's fellow halfway house residents had been calling and texting Wallace's cell phone because she was supposed to have returned to the halfway house by 5:00 p.m. (it was by then 8:00 p.m.), but Wallace had not responded. EX B

3

him on the warrants. The other officers (Winninger and Sandgren) saw the curtains move, so they went into the apartment. They found Wallace in a bedroom. She was crying and upset. She told them Smith would not let her leave. By that time, Smith was under arrest. When they entered the bedroom, they saw a semi-automatic rifle lying on the bed. Wallace was ultimately arrested and taken to jail for violating the no-contact order.[5]

### Sioux Falls Police Officer Jill Winninger

She responded to a check well being call on April 26, 2013 at 1021 S. 1st Avenue. She understood that Alexis Wallace had left her halfway house with her boyfriend and had not returned. By the time Winninger arrived, Smith had been arrested. They saw a curtain move in the residence. Smith told the other officers nobody else was in the residence, so they decided to go in. They entered and announced their presence. Nobody said anything. They announced again and a voice said "I'm in the back bedroom." They found Wallace in the bedroom.

### The Dispatch Narrative and 911 Calls

The Court also received a DVD of Jennifer's 911 calls. In the first call to 911, Jennifer asked for a well being check on Wallace because she believed Wallace was with Smith and that Smith was "holding her against her will," that Smith possessed weapons and was a drug user. She indicated Smith got "very very angry" and Jennifer was afraid Smith had "found her." In the second call to 911, Jennifer explained that the other residents had been pleading with Wallace to return to the halfway house because if Wallace did not return by 8:00, she would be "terminated" from the program. This information was relayed to the 911 operator along with the information that Wallace had finally texted indicating Smith had not let her leave. See EX 2.

The dispatch narrative was also received into evidence. It shows that by 8:00, it had been confirmed Wallace was not in jail, detox, or any of the hospitals. *See* EX C.

### DISCUSSION

Smith moves to suppress "all physical evidence seized from [his] residence in Sioux Falls,

---

[5]Wallace was also found to have cocaine in her property when she was booked into the jail.

South Dakota on April 26, 2013 on the ground that they are fruits of an illegal entry into his home that violated the Fourth Amendment to the United States Constitution." The Government asserts no Fourth Amendment violation occurred because the officers entered the apartment pursuant to the community caretaker exception to the Fourth Amendment warrant requirement. Alternatively, the Government argues the evidence would have been inevitably discovered.

**Burden of Proof**

As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. *United States v. Phillips*, 540 F.2d 319 (8th Cir.1976). The Government, however, bears the burden to prove a warrantless entry into the suspect's home was justified by one of the exceptions to the Fourth Amendment warrant requirement. *United States v. Selberg*, 630 F.2d 1292, 1294 (8th Cir. 1980). The standard of proof is a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

**1.     Whether the Community Caretaker Exception to the Warrant Requirement Applies**

"When the government enters a defendant's home without a warrant, we presume that the search was unreasonable and therefore in violation of the Fourth Amendment." *United States v. Valencia*, 499 F.3d 813, 815 (8th Cir. 2007) (citation omitted). The presumption is rebuttable in certain situations, however, such as when an exception to the warrant requirement applies. *Id.* The issue in this case is whether the community caretaker exception to the Fourth Amendment warrant requirement allowed the law enforcement officers to enter Smith's residence without a warrant.

The Eighth Circuit recently addressed the community caretaker exception in *United States v. Harris*, 747 F.3d 1013 (8th Cir. 2014).

> . . .Our circuit has recognized, under the 'community caretaker' classification, that noninvestigatory searches and seizures may be justified in certain limited situations.
>
> A search or seizure of a person by a police officer acting in the officer's noninvestigatory capacity is reasonable if the governmental interest in the police officer's exercise of the officer's community caretaking function, based on specific articulable facts, outweighs the individual's interest in being free from arbitrary government interference. The scope of the encounter must be carefully tailored to satisfy the purpose of the initial detention, and the police must allow the person to

> proceed once the officer has completed the officer's inquiry, unless of course the
> officer obtains further reason to justify the stop.
>
> \*\*\*
>
> One situation in which an officer may act under the community caretaker doctrine is
> when the officer has a reasonable belief that an emergency exists requiring his or her
> attention. When police must make a split-second decision in the face of an
> emergency to either stand idly by, permitting a dangerous situation to continue
> uninterrupted, or act, addressing the potential danger to protect the public, we have
> reasoned that officers are expected to act.

*Id.* at 1017 (citations omitted, punctuation altered). An example of an acceptable warrantless entry based on the community caretaker exception cited in *Harris* is when a reasonable officer could conclude someone is inside the home but is "unable to respond for some reason." *Id.*

The Eighth Circuit has likewise explained that "there is a difference between standards that apply when an officer makes a warrantless entry when acting as a so-called community caretaker and when he or she makes a warrantless entry to investigate a crime. Police officers, unlike other public employees, tend to be 'jacks of all trades' who often act in ways totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of criminal law." *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006). An officer's community caretaking activities, undertaken to help people in danger and to protect property, are unrelated to their duties to investigate and uncover criminal activity. *Id.* An officer may enter a residence without a warrant pursuant to community caretaker duties if there is a reasonable belief that an emergency exists which requires attention. *Id. citing Mincey v. Arizona*, 437 U.S. 385, 392-93, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Reasonable belief, the standard used to determine whether an officer may enter without a warrant pursuant to his or her community caretaker duty, is a less exacting standard than probable cause. *Id.*

During the hearing, Smith argued the officers' entry into his home was unreasonable because (1) at the time they entered he (Smith) had already been arrested and (2) they never had specific information that Wallace –even if she was in the residence--was injured or restrained.

The facts that *were* known to the officers the moment before they entered Smith's apartment, however, caused them to have legitimate concerns for Wallace's welfare and to believe they would

6

find her inside. The known facts were: (1) Wallace told her halfway house friend she was going to Smith's house to gather her belongings and would return in about a half hour; (2) several hours had passed and Wallace had not returned; (3) Wallace's failure to return to the halfway house or to contact anyone there was against her own best interest because it was past her curfew; (4) Wallace was not answering her own friends' phone calls or texts; (5) Wallace's friend told the officers Smith had a weapon, had been "controlling" and a drug-user in the past; (6) Smith denied he'd seen or talked to Wallace recently despite the officers' knowledge to the contrary; (7) Smith denied there was anyone else in his apartment despite the officers' knowledge to the contrary; (8) Wallace was not in the hospital, had not been arrested and had not returned to the halfway house or any local detox facility; (9) whomever was in the apartment did not spontaneously come out after Smith was arrested; (10) whomever was in the apartment did not answer when the police knocked on the door; (11) whomever was in the apartment did not immediately answer when the police first entered the apartment, announced themselves and requested that if anyone was present they should call out.

That the officers did not have an affirmative statement from Jennifer that Wallace had been harmed by Smith, or that they did not hear an audible cry for help from inside the apartment does not invalidate their entry into Smith's apartment under the community caretaker doctrine.

> We do not think that the police must stand outside an apartment, despite legitimate concerns about the welfare of an occupant, unless they can hear screams. Doubtless outcries would justify entry, but they are not essential. The less intrusive a search, the less justification is required. This is true not only of street stops, but also of residential searches. The question posed by the Fourth Amendment is not whether it would have been reasonable to get a warrant, but whether the search itself was reasonable. Entry into a domicile usually requires a search warrant, which can only be had on probable cause, but quick inspections may be justified by lower degrees of suspicion. . . .

*United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995). In *Brown*, the Seventh Circuit affirmed the warrantless search based on the exigency exception. As it turned out, the person inside the house was never in danger–but the officers' concerns about the person inside at the time they entered were legitimate. The Court noted:

> Had they known then what we know now . . . .they would have required a warrant to enter. But at the time the objective indicators [suggested otherwise]. The reasonableness of the search depends on what the police know at the time, not what they learn later.

7

\*\*

An officer on the beat must be allowed latitude to make snap judgments, subject to the requirement of reasonableness. The decision to take a brief look inside Apartment 203 was a reasonable one, carried out reasonably. Entry indeed was practically invited by [the defendant]. Had he told the agents the truth, that [would have dispelled concern about the person upon whose welfare they were checking when they entered.].

*Id.* at 1086-87. *See also Martin v. City of Oceanside*, 360 F.3d 1078, 1082-83 (9th Cir. 2004) (warrantless entry justified under community caretaking exception when it was obvious residents were at home, but inexplicably did not answer the door after concerned father called police and asked for a well-being check on his daughter); *United States v. Tamborello*, 2010 WL 2802603 (N.D. Ia.) (warrantless entry justified under community caretaking doctrine; officers believed two unsupervised children were in home where guns were present but nobody answered their repeated knocks on the door).[6] Similarly, in this case, had the officers on the scene at 1021 E. 1st Avenue known at the time what we know now (that Wallace was sitting in the back bedroom unharmed and unrestrained, but did not immediately jump up and flee the apartment after Smith's arrest for reasons which remain unexplained but can be guessed),[7] they may have made a different decision about whether to enter the apartment without a warrant. But the Fourth Amendment does not require patrol officers to be clairvoyants. It only requires them to make reasonable judgments. "The reasonableness of the search depends on what the police know at the time, not what they learn later." *Id.*

In this instance, the officers could have reasonably concluded that Wallace was inside Smith's apartment but, for some reason, even after Smith's arrest, was unable to exit under her own power. Based on that reasonable belief, they were justified in entering the apartment pursuant to their community caretaking function. *United States v. Quezada*, 448 F.3d 1005, 1008 (8th Cir. 2006). Because the officers entered Smith's apartment lawfully, the gun they saw in the bedroom where Wallace was found is admissible under the plain view doctrine. *Id. citing Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

---

[6]In *Tamborello*, the Court noted, "arguably, if the officers had left the scene without checking on the children or attempting to safeguard their well being, the officers would have been derelict in their duty." *Id.* at \*6.

[7]At the evidentiary hearing in this matter, Officer Van Ravenswaay explained Wallace was ultimately arrested for violating the no-contact order and that she possessed cocaine.

8

## 2.    The Inevitable Discovery Doctrine

Although the issue is not briefed by either party, the Government urged during the evidentiary hearing that even if the Court finds the community caretaker doctrine does not apply, the evidence Smith wishes to suppress would have been inevitably discovered. The Government theorizes that although the text from Wallace[8] was reported to the officers after they had already entered Smith's apartment, they surely would have entered the apartment pursuant to either the community caretaker or exigent circumstance exception to the warrant requirement once they did receive the information about the text, and therefore would have discovered the gun in the bedroom anyway.

Because this court has determined the entry was reasonable under the Fourth Amendment pursuant to the community caretaker doctrine, the inevitable discovery doctrine need not be discussed at length. Smith was arrested at 8:14. The officers entered the house four minutes later at 8:18. They located Wallace at 8:19. It is unknown exactly when Wallace sent the text to Jennifer, but dispatch received the call from Jennifer about the text at 8:25 and dispatch relayed the message at 8:26. What is completely unknown and unknowable is whether, had the police not entered the apartment at 8:18, Wallace would have voluntarily exited in the ensuing eight minutes by 8:26, or would have remained silently in the back bedroom as she had for the first four minutes that Smith had been under arrest.

To prevail under the inevitable discovery exception to the exclusionary rule, "the government must establish (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir. 2008) (citations omitted). The police officers testified that when they found her, Wallace indicated her intent was to leave the apartment and Smith, who had by then been arrested, had been the only thing keeping her there. Yet inexplicably, she had not yet made any effort to leave by the time the officers entered the apartment.

---

[8]Recall the substance of the text indicated that Smith would not allow Wallace to leave. This is also what Wallace told the officers after they located her in the apartment.

There is no question the officers would have inevitably received the information from dispatch indicating Wallace texted to her friends that Smith would not let her leave. The question is, what would have happened if they had not yet entered the apartment when they received the information about the text?

If, by the time the officers received the information about the text at 8:26, they had not yet entered the apartment and Wallace and not yet exited, their justification for entering under the community caretaker exception would have been even stronger because there would have been even more reason to suspect Wallace was inside the apartment but unable to leave under her own power. If Wallace *had* exited the apartment by the time the officers received the information about the text but the officers had *not* already entered the apartment, the officers would have had probable cause to get a warrant to search for evidence of a crime.[9] Either way, the gun in the bedroom would have inevitably been discovered and would therefore be admissible.

## CONCLUSION

For the reasons more fully explained above, it is respectfully RECOMMENDED to the District Court that Defendant's Motion to Suppress (Doc. 31) be DENIED.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

Dated this ___5___ day of September, 2014.

BY THE COURT:

_____
John E. Simko
United States Magistrate Judge

---

[9]For example, Kidnapping in violation of SDCL § 22-19-1 or 22-19-1.1, or False Imprisonment in violation of SDCL § 22-19-17.