UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>  vs.<br><br>CODY MICHAEL SMITH,<br><br>          Defendant. | 4:13-CR-40139-KES<br><br><br>ORDER ON OBJECTIONS TO<br>REPORT AND RECOMMENDATION<br>DENYING MOTION TO SUPPRESS |

**NATURE AND PROCEDURE OF CASE**

Defendant, Cody Michael Smith, is charged with possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(9). Defendant moves to suppress all physical evidence seized from his residence on the ground that they are the fruits of an illegal entry into his home, which violated the Fourth Amendment to the United States Constitution. Docket 31. The motion was referred to a United States magistrate judge for a report and recommendation.

An evidentiary hearing was held on August 19, 2014. During the hearing, testimony from three law enforcement officers was presented, and six exhibits were received into evidence. On September 5, 2014, the magistrate judge issued a report and recommendation denying Smith's motion to suppress. Docket 43. Smith filed objections to portions of the report and recommendation

on October 17, 2014. Docket 53. For the following reasons, the report and recommendation is adopted as modified by this opinion.

**LEGAL STANDARD**

This court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 72 of the Federal Rules of Civil Procedure. The court reviews de novo any objections to the magistrate judge's recommendations with respect to dispositive matters that are timely made and specific. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Because motions to suppress evidence are considered dispositive matters, a magistrate judge's recommendation regarding such a motion is subject to de novo review. 28 U.S.C. § 636(b)(1)(A); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980). In conducting de novo review, this court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

**FACTS**

According to the testimony given and exhibits introduced during the evidentiary hearing, the pertinent facts are as follows:

On April 26, 2013, a resident of a half-way house in Sioux Falls called 911 to request a well-being check on Alexis Wallace, another resident of the half-way house. The caller, identified as Jennifer, expressed concern that Wallace had not returned to the half-way house by curfew. Jennifer believed that Wallace's ex-boyfriend, whom she identified as Smith, was holding Wallace

2

against her will. When the operator asked if Smith was known to have any weapons on him, Jennifer responded, "I'm sure of it, I'm sure." Additionally, when asked why she thought Smith was holding Wallace against her will, Jennifer responded that there was a no contact order between Smith and Wallace, that Smith was a known drug user, and that Smith would get "very, very, very angry." Jennifer stated that Wallace was supposed to have returned to the half-way house by 5 p.m., but that she was worried Smith had "found" Wallace.

Responding to the 911 call, officers Sandgren, Van Ravenswaay, and Lieuwen drove to Smith's home at 1021 S. 1st Avenue to look for Wallace. Sandgren described his familiarity with this same 1st Avenue residence to the other officers on the scene. As Sandgren explained, police had arrived at that location sometime in the recent past in order to respond to a male suspect who was discharging firearms outside the home. Sandgren video at 19:49-50. Sandgren believed Smith was that same individual. After Smith had been arrested, however, Sandgren learned his belief was mistaken.

At approximately 7:52 p.m., the officers knocked on the door to Smith's residence and identified themselves. When Smith answered the door, Sandgren asked, "Is Alexis here?" to which a negative answer was given. *Id.* at 19:52. Sandgren's voice is then heard saying "No," although no audible response from Smith himself is picked up by any of the officers' wireless microphones. *See id*; *see also* Van Ravenswaay video at 19:52. Later, Smith is heard saying, "She isn't here[.]" Sandgren video at 19:53. Ultimately, Smith denied the officers

3

access to his apartment in order to look for Wallace, and he demanded they return with a warrant before their entrance would be allowed.

Following this exchange, the officers returned to their patrol cars and discussed what to do next. Sandgren indicated that, at this point, they were merely "guessing" whether Wallace was inside the apartment or not. *Id.* at 19:56. The officers discussed the possibility of pinging Wallace's phone and radioed in for a check for Wallace at the local jail, hospitals, detox facilities, and other areas. *Id.* Between 7:58 and 8 p.m., dispatch told the officers that Wallace was not present at those locations. Ex. C (Computer aided dispatch timeline). Also during this time, because Sandgren believed he knew Smith from prior incidents at the 1st Avenue residence, he expressed his belief that Smith would not let them inside whether Wallace was there or not. Sandgren video at 19:57. Shortly thereafter, the officers learned Smith had outstanding, unrelated warrants for his arrest. Additionally, the officers decided to call Jennifer again in order to gain more specific information about why she felt Wallace was at Smith's home.

Van Ravenswaay returned to his patrol car and called Jennifer. Van Ravenswaay video at 20:03. Jennifer stated that Wallace had left the half-way house around 4:25 p.m. Further, Jennifer told Van Ravenswaay that Smith had been overheard yelling at Wallace over the phone, that Wallace went to Smith's home because she still had some personal belongings there, and that Wallace said she would return by 5 p.m. By this time, however, it was after 8 p.m. Although other residents of the half-way house had called and left

messages on Wallace's phone, no one had heard from Wallace since her departure. Van Ravenswaay relayed the information Jennifer provided to the other officers.

While Van Ravenswaay was on the phone with Jennifer, Sandgren and Lieuwen exchanged several comments about Smith's appearance. Sandgren remarked that "it doesn't even look like him, the same guy. Sandgren video at 20:07. A short time later, one of the two officers stated that "the whole shape of his face changed" and that "he's got to be using meth." *Id.* at 20:08. Following the officers' discussion with Van Ravenswaay, Sandgren requested an additional police unit to be dispatched to the area. *Id.* at 20:09.

Around 8:13, the officers noticed Smith had emerged from his home to take out the trash. The officers arrested Smith on his outstanding warrants and placed him in the back of Sandgren's patrol car.  During his arrest, Smith reiterated that the police could not enter his home without a warrant. Nonetheless, Sandgren stated, "We're going in the house" because the police had "information that [Wallace is] here," and that they have an "obligation to check to make sure she's safe." *Id.* at 20:16.

Officer Winninger, the additional officer Sandgren requested, arrived on the scene at approximately 8:17. By this time, Smith had been arrested and placed in the back seat of Sandgren's patrol car. While Sandgren was briefing Winninger of the situation, Sandgren noticed that "someone just looked out the back window" of Smith's residence. *Id.* at 20:17. Sandgren stated that the officers had "talked to Cody, he said she's not here," and that the officers were

"going to go in his house whether he likes it or not." *Id.* at 20:17-18. Shortly thereafter, the officers announced their presence at the front door and entered Smith's apartment. Wallace did not respond immediately when the police called out. A short time later, however, Wallace indicated she was in the bedroom. *Id.* at 20:18. Sandgren later testified that Wallace was unrestrained when they found her, and that she stated the only thing preventing her from leaving the residence was Smith. Tr. 22:8-13. In addition to locating Wallace in the bedroom, the officers saw an AK-47 partially covered by a bed sheet.

At approximately 8:28, dispatch radioed that Jennifer had made a second 911 call. During this call, Jennifer indicated that Alexis had sent a text message which stated that Smith would not let her leave.[1] For approximately an hour, the officers remained on the scene while questioning Wallace and Smith. At 9:36, the officers left the 1st Avenue home with Smith and Wallace in custody, as well as taking possession of the AK-47 and other evidence found in the home. During this drive back to the police station, Sandgren learned for the first time that Smith was not the same individual involved in the earlier incidents at the 1st Avenue home. Sandgren video at 21:39.[2] Sandgren remarked, however, that, "You look just like him, similar." *Id.* at 20:40.

_____

[1] According to Wallace, she was able to send this text message while Smith was being detained by the officers after Smith left the apartment to take out the trash. Winninger video at 20:33.

[2] When Sandgren recounted the incident with the individual discharging firearms in public, Smith explained that person's name was Lawrence Larsen, a previous resident of the 1st Avenue home, and that Smith had been living in the home for about six months. Sandgren video at 21:39. A man named

## DISCUSSION

### I.    Factual Objections

#### A.    Objection 1

Smith objects to the report and recommendation's finding that "Sandgren had prior knowledge of [the 1st Avenue] address and that there had been weapons fired, but he could not remember the name of the person with whom he dealt when he was previously at the apartment." Docket 43 at 2 (report and recommendation); Docket 53 at 6 (objection). Specifically, Smith objects to the omission of additional statements Sandgren made regarding Smith's resemblance to a previous tenant of the 1st Avenue apartment whom police had earlier dealt with, as well as statements concerning the shape of Smith's face.

The factual finding Smith objects to is located in a section of the report and recommendation designated as a summary of Sandgren's testimony. *See* Docket 43 at 1-3. Sandgren and Lieuwen talked about Smith's resemblance to the other individual while they waited for Van Ravenswaay to contact Jennifer. The officers' conversation about Smith's appearance, however, was not brought up during the evidentiary hearing by either party.

Instead, Sandgren testified he had been involved with at least one previous call to the 1st Avenue apartment in the past, when the police had

---

Lawrence Victor Larsen had been arrested at the 1st Avenue home in March, 2012, after shots were reported in the area. *See, e.g.*, *Man Behind Bars After Standoff*, KELOLAND.com, http://www.keloland.com/communities/ siouxfalls/localdetail12032.cfm?id=129091 (last visited October 31, 2014).

7

dealt with a man who had been discharging firearms outside the residence. When the officers arrived to look for Wallace, Sandgren believed Smith was that same individual. Tr. 6:2-5. Sandgren stated on cross-examination, however, that he did not remember the name of the man he had previously dealt with. Tr. 14:7-12. Sandgren also acknowledged that his belief that Smith was the same individual was ultimately mistaken. Tr. 13:12-14. Although Sandgren turned out to be incorrect, the report and recommendation accurately summarizes Sandgren's testimony with respect to what he believed when he arrived at the scene.[3] Therefore, Smith's objection is overruled.

### B.    Objection 2

Smith objects to the report and recommendation's finding that Sandgren spoke to Jennifer after the officers met with Smith at his doorstep. Docket 53 at 7. Smith contests that Van Ravenswaay, rather than Sandgren, spoke to Jennifer. *Id.* Although no specific portion of the report and recommendation is cited, it appears that Smith's objection is aimed at the summary of Sandgren's testimony from the evidentiary hearing. *See* Docket 43 at 1-3. In that summary, the report and recommendation notes that "[Jennifer] confirmed she knew . . ." and that "Wallace told Jennifer . . .".

---

[3] Much of Smith's objection centers on the reasonableness of Sandgren's mistake as well as the effect of that mistake on the officers' decision to enter Smith's apartment. *See* Docket 53 at 7 ("The effect of this unreasonable fiction on Sandgren's decision to enter cannot be overstated.") The court's inquiry here, however, is whether the report and recommendation accurately summarized Sandgren's testimony.

The audio recordings from the officers' wireless microphones show that it was Van Ravenswaay who in fact spoke to Jennifer. Van Ravenswaay video at 20:03. The recordings also show that Van Ravenswaay relayed the information from his conversations with Jennifer to the other officers at the scene. Although Sandgren testified, "I contacted Jennifer again" and that "[s]he told me," Docket 44 at 7, the report and recommendation does not appear to conclude that it was Sandgren who spoke to Jennifer. Instead, it states that "[t]he officers retreated to their patrol cars," and that "they could still see the apartment and re-contacted the reporting party (Jennifer)." Thus, the report and recommendation does not specifically attribute the phone calls with Jennifer to Sandgren or any particular officer. Therefore, to the extent that the report and recommendation indicates that Jennifer was contacted by phone after the officers spoke to Smith, Smith's objection is overruled. To the extent the report and recommendation can be said to conclude that Sandgren called Jennifer, however, Smith's objection is sustained.

### C.    Objection 3

Smith objects to the report and recommendation's finding that Jennifer had seen Wallace get into Smith's vehicle. Docket 53 at 7-8. Smith asserts that this occurrence was fabricated by Sandgren. *Id.* As with Objection 2, this objection appears to be aimed at the report and recommendation's summary of Sandgren's testimony. The report and recommendation states that "[Jennifer] confirmed that she knew Wallace was with Smith because she saw Wallace get into his car." Docket 43 at 2. A footnote follows this sentence, however, which

9

explains that "[t]his was Sandgren's testimony, but he conceded that the [video evidence] would more accurately portray the encounter as it unfolded." *Id.* n.2. The same footnote states

> Officer Van Ravenswaay testified he did not recall Jennifer told the officers Wallace got into Smith's vehicle and did not recall any of the law enforcement officers knew about Wallace getting into Smith's car before they entered Smith's residence. The recordings reveal Wallace told the officers she'd gotten into Smith's car. Wallace told the officers that detail when she was being interviewed, *after* she was safely outside Smith's residence.

*Id.* (citation omitted, emphasis in original). The report and recommendation accurately summarizes the direct testimony of the two officers. *See* Docket 44 at 7, 17; *see also id.* at 37. Unlike with the finding at issue in Objection 2, however, the footnote here further clarifies that the magistrate judge was merely summarizing the testimony at the evidentiary hearing, rather than adopting Sandgren's specific statement as a finding. Therefore, Smith's objection is overruled.

### D.    Objection 4

Smith objects to the report and recommendation's finding that the officers decided to enter Smith's residence after seeing curtains in one of the apartment windows move. Docket 43 at 4 (report and recommendation); Docket 53 at 8 (objection). Smith claims that the decision to enter his apartment was made before any movement of the curtains was observed. Docket 53 at 8. In the summary of Van Ravenswaay's testimony, the report and recommendation states, "[t]he other officers (Winninger and Sandgren) saw the curtains move, so they went into the apartment." Docket 43 at 4. Similarly, while summarizing

10

Winninger's testimony, the report and recommendation states, "[t]hey saw a curtain move in the residence. Smith told the other officers nobody else was in the residence, so they decided to go in." *Id.*

Van Ravenswaay testified as follows:

Q:   After that arrest took place, was a decision made to enter the residence?

A:   Yes.

Q:   Why was that decision made?

A:   Officer Sandgren and Officer Winninger, who were both on scene at the time, saw somebody else peek through the window and decided to go in and check the well-being.

Tr. 34:12-18. Additionally, Winninger testified as follows:

Q:   Did you see a person in that window?

A:   I did, but I couldn't identify male or female at that time.

Q:   At that time had Mr. Smith already been arrested?

A:   Yes.

Q:   What happened then after you saw that face in the window?

A:   Shortly after that, officers made entry into the residence.

Tr. 46:24-25; 47:1-7. Thus, with respect to the officers' direct testimony, the report and recommendation provides an accurate summary.

On cross-examination, however, Winninger was asked if the decision to enter the residence had already been made by the time she arrived on the scene, to which Winninger responded affirmatively. Tr. 48:16-18. Moreover, the video evidence before the court shows Sandgren's declaration that "we're going

in the house" was made before Winninger arrived and before the movement in the window was observed. Sandgren video at 20:16. Although Sandgren reiterated to Winninger that they were going to enter Smith's apartment after they saw someone looking out the back window, it appears the decision to do so had already been made by that point. Thus, to the extent that the report and recommendation can be said to summarize the direct testimony of Van Ravenswaay and Winninger, Smith's objection is overruled. To the extent the report and recommendation finds the decision to enter Smith's apartment arose after the officers observed movement in the window, however, Smith's objection is sustained.

### E.    Objection 5

Smith objects to the report and recommendation's finding that the officers knocked and announced their presence before entering Smith's apartment. Docket 43 at 3, 7 (report and recommendation); Docket 53 at 8 (objection). Smith asserts that none of the officers testified that they knocked on Smith's door, that no audible knocking sound can be heard in the video, and that the video does not show a knock taking place. Docket 53 at 8. In the summary of Sandgren's testimony, the report and recommendation states, "[The officers] knocked and announced 'police' " before entering. Docket 43 at 3. Appearing later, in a section analyzing facts known to the police officers before entering the apartment, the report and recommendation states, "whomever was in the apartment did not answer when the police knocked on the door[.]" *Id.* at 7.

12

When the officers made their initial contact with Smith, there is an audible knocking sound picked up by the officers' wireless microphones. Sandgren video at 19:52. When the officers entered the apartment, however, no knock appears to be recorded. *Id.* at 20:18. On cross-examination, Sandgren was asked, "When you knocked, you knocked and announced 'police.' Correct?" Tr. 23:25; 24:1. This exchange was related to the officers' first conversation with Smith outside his doorstep, however, and not when the officers entered his apartment. To the extent the report and recommendation indicates that the officers knocked on the door during their first meeting with Smith, and that only Smith answered, Smith's objection is overruled. To the extent the report and recommendation purports that the officers knocked on the door before they entered Smith's apartment, however, Smith's objection is sustained.

### F.      Objections 6

Smith objects to the report and recommendation's finding that Smith had denied anyone else was inside his residence "despite the officers' knowledge to the contrary." Docket 43 at 7 (report and recommendation); Docket 53 at 8 (objection). Smith's objection to this portion of the report and recommendation has two, separate components. First, Smith argues he only told the officers that Wallace was not in his apartment, and that he did not claim to be alone. Docket 53 at 8. Second, Smith contends that the officers did not obtain "knowledge to the contrary" until after they had already decided to enter his apartment. *Id.* at 8-9. The report and recommendation states, in the

13

paragraph listing facts that were known to the officers "the moment before they entered Smith's apartment," that "Smith denied there was anyone else in his apartment despite the officers' knowledge to the contrary." Docket 43 at 6-7.

First, as detailed above, although Smith's initial response to Sandgren's question cannot be heard, the audio recordings show that the officers' inquiry was specifically directed at whether Wallace was present in the apartment, not whether Smith was alone. At the evidentiary hearing, Sandgren testified that "When I initially talked with Cody at the door, he told me he was alone in the residence." Tr. 20:3-4. Officer Van Ravenswaay testified, however, that "Officer Sandgren and I approached the front door. Cody came to the door. We asked if Alexis was there. He claimed she wasn't there."[4] Thus, Van Ravenswaay's testimony appears to be the most consistent with the audio recordings. Therefore, because Smith did not claim to be alone, but only that Wallace was not at his apartment, that portion of his objection is sustained.[5]

Second, as with Objection 4, the officers had made their decision to enter Smith's apartment before noticing anyone looking out the apartment window. The report and recommendation purports to list certain facts that were known to the officers the moment before they actually entered Smith's apartment,

---

[4] Winninger testified that it was her understanding Smith had claimed no one else was present in the residence but, as developed on cross-examination, acknowledged that she was not present when the conversation with Smith occurred. Tr. 47:8-11; 48:4-10.

[5] As a practical matter, however, the difference in effect between Smith telling the officers that he was alone and telling them that Wallace was not present is slight.

however, and is not limited to the facts the officers knew when the decision to enter was made. Thus, to the extent the report and recommendation states that the officers' knowledge of another individual in the apartment factored into their initial decision to enter, Smith's objection is sustained. To the extent the report and recommendation notes the facts known to the officers at the time they entered the apartment, including facts learned after the decision to enter was made, Smith's objection is overruled.

### G.     Objection 7

Smith objects to the report and recommendation's finding that Jennifer told the police that Smith possessed a weapon. Docket 43 at 7 (report and recommendation); Docket 53 at 9 (objection). Smith contends that the context of Jennifer's first 911 call reveals that Jennifer was only voicing negative feelings about Smith and does not demonstrate that she had any specific knowledge about Smith owning a weapon. Docket 53 at 9. In the paragraph listing facts known to the officers before they entered Smith's apartment, the report and recommendation states that "[Jennifer] told the officers Smith had a weapon[.]" Docket 43 at 7.

During the first 911 call, the operator asked Jennifer if Smith was known to carry weapons. Jennifer responded, "I'm sure of it, I'm sure." The tone of Jennifer's statement, as Smith contends, suggests more of a generalized belief that Smith probably owned a firearm, rather than Jennifer's specific knowledge that he possessed one. Although the substance of what was radioed to the

officers by dispatch is unknown, the computer aided dispatch timeline notes that "Cody has been known to carry weapons." Ex. C.

While Smith objects to the report and recommendation's appearance of accepting Jennifer's statement, it does accurately reflect the information provided to the officers. Moreover, Sandgren had a separate–albeit erroneous–belief that Smith was the same individual the police had encountered at the 1st Avenue apartment earlier who had been discharging firearms outside the residence. Even without Jennifer's statement, the record shows that the officers would have believed Smith was armed for the reasons stated by Sandgren when the officers arrived on the scene. For these reasons, Smith's objection is overruled.

### H.    Objection 8

Smith broadly objects to the report and recommendation's "description of Officer Sandgren's testimony." Docket 53 at 9-12. Smith chronicles a number of instances that "convey just how demonstrably unreliable and/or deceptive Sandgren's testimony was during the state and federal suppression hearings." *Id.* at 9. Illustrative of this contention, Smith claims: (1) Sandgren stated he received the information contained in Jennifer's second 911 call before he entered Smith's apartment, although the record showed that timeline was impossible; (2) Sandgren claimed to have spoken to Jennifer, although the record showed it was Van Ravenswaay who spoke to Jennifer; (3) Sandgren claimed that Jennifer told him she had seen Wallace get in Smith's vehicle, which Van Ravenswaay testified was incorrect; and (4) Sandgren did not

16

acknowledge his mistaken belief regarding Smith's identity until cross-examination. *Id.* at 9-12.

Notably, the report and recommendation does not appear to rely on any of the alleged inaccuracies in Sandgren's testimony. As discussed with Objection 2, the report and recommendation does not appear to adopt Sandgren's claim that he spoke with Jennifer. Likewise, as explained with Objection 3, the report and recommendation does discuss Sandgren's testimony about Wallace entering Smith's vehicle, noting "[t]his was Sandgren's testimony, but he conceded that the [video evidence] would more accurately portray the encounter as it unfolded." *Id.* n.2. Additionally, the report and recommendation indicated it was summarizing the testimony given at the federal suppression hearing, and it does not include statements made by Sandgren at the state proceedings. Moreover, Smith's objection appears to be a generalized grievance directed at Sandgren's testimony, rather than an objection to any factual finding made by the magistrate judge. For these reasons, Smith's objection is overruled.

## II.    Fourth Amendment

The Fourth Amendment provides for "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. Warrantless searches and seizures carried on inside an individual's home are presumptively unreasonable. *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). "It is therefore well-established that the police may not invade a person's house without a warrant

except under very limited circumstances, such as the presence of exigent circumstances or an occupant's consent." *United States v. McMullin*, 576 F.3d 810, 815 (8th Cir. 2009). Here, the officers did not have a warrant to enter Smith's apartment, and Smith did not consent to their doing so. Thus, the question is whether the officers were nonetheless justified to enter Smith's home.

### A.  Community Caretaking Function

The report and recommendation found that the officers were permitted to enter Smith's apartment in order to look for Wallace pursuant to carrying out their community caretaking functions. Docket 43 at 8. Additionally, it concluded that because the officers entered Smith's apartment lawfully, the firearm that was found in the bedroom is admissible under the plain view doctrine. *Id.* Smith contends that the officers could not have reasonably believed Wallace was inside Smith's apartment or that she required assistance. *See, e.g.*, Docket 53 at 14, 16. Thus, he argues, the officers had no basis for entering his home, and the evidence seized within should be suppressed. *Id.* at 17.

In *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973), the Supreme Court discussed what it labeled as the "community caretaking functions" of local police officers. There, officers had impounded a vehicle that belonged to a man who identified himself as a member of the Chicago police department. Believing Chicago policemen were required to carry a revolver at all times, one of the officers searched the vehicle after the police were unable to locate a revolver on

18

the man. *Id.* at 437. While conducting the search, the officer discovered evidence inside the vehicle related to a then-unknown murder. *Id.* As the Court explained, "at the time the search was conducted [the officer] was ignorant of the fact that a murder, or any other crime, had been committed." *Id.* at 447. Rather, the search was motivated by the officer's "concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." *Id.* Thus, the Court noted that an officer's community caretaking functions are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441.

The Eighth Circuit has also recognized "that noninvestigatory searches and seizures may be justified in certain limited situations" when officers are carrying out their community caretaking functions. *United States v. Harris*, 747 F.3d 1013, 1017 (8th Cir. 2014) (citing cases). In *Harris*, although the case involved the search and seizure of a person, the Eighth Circuit laid out its analytical framework for the community caretaker doctrine. First, the court must "determine the capacity in which the officers were acting here because 'there is a difference between the standards that apply when an officer [acts] as a so-called community caretaker and when he or she [acts] to investigate a crime.'" *Id.* at 2018 (quoting *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006) (alterations in original)). Second, the court "must weigh the government's interest in the officers' actions against [the defendant's] right to be free from government intrusion." *Id.* Third, if the initial intrusion is justified,

19

the court "must assess whether the scope of the [entry] was carefully tailored to satisfy the purpose of the [intrusion]." *Id.* at 1019.

### i.    Capacity of the Officers

Although the report and recommendation cites to the Eighth Circuit's *Harris* opinion, Docket 43 at 5, neither it nor Smith's objections appear to follow its analytical approach. Nonetheless, with respect to the capacity in which the officers were acting, the officers were responding to a 911 call requesting that the police perform a well-being check on Wallace, a resident of a half-way house. The call, made by another resident of the same half-way house, indicated that Wallace had missed her curfew. Additionally, the caller expressed her concern that Wallace was being held against her will by Smith, whom Wallace was prohibited from having contact with. When the officers approached Smith's residence, they asked him if "Alexis [is] here?" Sandgren video at 19:52. After their initial discussion with Smith, the officers discussed pinging Wallace's phone in order to see if she was in the area. *Id.* at 19:56. The officers also put out a search for Wallace at the local jail, hospitals, detox facilities, and other locations. *Id.* Immediately before the officers entered Smith's apartment, Sandgren told Winninger that "now we're going to go check on her because we basically have information that this is where she's at." *Id.* at 20:17. Thus, rather than searching for criminal activity, the officers were responding to the 911 call in order to check on the well-being of Wallace.

In *United States v. Nord*, 586 F.2d 1288, 1289 (8th Cir. 1978), officers entered the defendant's apartment after being let in by a neighbor. The

20

neighbor was concerned that the defendant was intoxicated and had been missing work. *Id.* Inside, the officers observed firearms laid out in plain view, which were later used to prosecute the defendant for being a felon in possession of firearms. *Id.* The Eighth Circuit noted that the "situation confronting the officers had certain emergency features," and it upheld the district court's conclusion that the officers had a right to be on the premises as part of their community caretaking functions. *Id.* at 1290-91. Those community caretaking functions, the court explained, involved "responding to calls to assist person in need of immediate aid." *Id.* at 1290. Here, the officers were responding to a 911 call, and their concern was rendering assistance to Wallace. Although the officers may have believed Smith was the same individual who had discharged firearms in the area previously, and that the possibility Wallace was being held against her will may have suggested a potential kidnapping, the officers' activities were "undertaken to help those in danger and . . . [were] part of the officer's 'community caretaking functions.' " *See Quezada*, 448 F.3d at 1007. Therefore, the court finds that the officers were acting within their capacity as community caretakers.

**ii.    Justification for the Initial Intrusion**

Although the Supreme Court's decision in *Cady* involved a search of a vehicle, and the Court elaborated upon its justification for treating automobile searches differently than searches in the home, *Cady*, 413 U.S. at 441-42, the Eighth Circuit has applied the community caretaker doctrine to searches of a residence. *Cf. Quezada*, 448 F.3d at 1007 (citing *Mincey v. Arizona*, 437 U.S.

385, 392-93 (1978); *Nord*, 586 F.2d at 1291 n.5). In *Quezada*, a deputy sheriff arrived at an apartment in order to serve a child protection order. Although the door to the apartment was closed, the door opened slightly when the deputy knocked. *Id.* at 1006. The deputy could see that the lights were on through the gap in the door and could hear sounds from a television emanating from within. *Id.* He then shouted into the apartment in order to announce his presence, but he did not receive a response. *Id.* After radioing these details back to dispatch, the deputy drew his weapon and entered the apartment. *Id.* The defendant, a convicted felon, was found inside the apartment and in possession of a firearm. *Id.*

The Eighth Circuit held that the officer was acting within his role as a community caretaker, as his decision to enter was an activity "undertaken to help those in danger." *Id.* at 1007. Additionally, because the deputy was acting within his capacity as a community caretaker, his decision to enter the apartment could not be judged by the same standard as if he were entering the apartment to search for criminal activity. *Id.* Instead, the court explained, "[a] police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention." *Id.* (citing *Mincey*, 437 U.S. at 392-93; *Nord*, 586 F.2d at 1291 n.5). Additionally, the court explained that the "reasonable belief" standard "is a less exacting standard than probable cause." *Id.* (citing *Maryland v. Buie*, 494 U.S. 325, 336-37 (1990)). Discussing the facts before the court, the Eighth Circuit noted that if the apartment had appeared quiet and

22

dark, it would have been reasonable to assume the tenant simply did not secure the door before leaving. *Id.* at 1008. But because the lights and television were on, the circumstances suggested someone was at home. *Id.* Additionally, because the deputy shouted into the apartment several times and did not receive a response, "a reasonable officer in the deputy's position could conclude that someone was inside but was unable to respond for some reason." *Id.* Thus, the deputy's decision to enter the apartment was reasonable.

In order to assess whether the officers here had a reasonable belief that an emergency existed which required their attention, that belief must be based upon "specific articulable facts." *Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2006) (quoting *Winters v. Adams*, 254 F.3d 758, 767 (8th Cir. 2001) (Bye, J., concurring)). In *Quezada*, for example, the officer observed specific details as he stood before the opened door to the apartment itself, and he decided to enter soon after. *Id.* at 1006. The report and recommendation lists a number of specific facts that were known to the officers "the moment before they entered Smith's apartment." Docket 43 at 6. As Smith contests, however, the officers made their decision to enter the apartment a few minutes prior to entering and prior to observing any movement in the apartment windows. Docket 53 at 15; *see* Sandgren video at 20:16. Because the decision to enter was not made contemporaneously with the entrance itself, the appropriate reference point here is limited to when the initial decision to enter was made. *See Quezada*, 448 F.3d at 1006; *see also United States v. King*, 990

23

F.2d 1552, 1562 (10th Cir. 1993) (describing the officer's initial decision to seize an individual as "justified at its inception").

Thus, in the present case, the specific information possessed by the officers when their decision to enter Smith's apartment was made is as follows: (1) Wallace left the half-way house at around 4:25 p.m. and had not returned by her 5 p.m. curfew; (2) the first 911 call indicated Smith may be holding Wallace at his apartment and against her will; (3) the 911 call also informed the officers that Wallace and Smith had previously been dating, and that there was a no-contact order between them; (4) Wallace was not in jail, nor had she been taken to a hospital, detox facility, or other similar location; (5) Sandgren believed he knew Smith from a prior incident at the same residence, and that Smith may be armed and potentially dangerous; (6) Sandgren later expressed confusion about Smith's change in appearance compared to the individual he encountered previously, which the officers discussed may be due to drug use; (7) although Smith denied having contact with Wallace, Jennifer subsequently told Van Ravenswaay that Smith had been heard over the phone yelling at Wallace; (8) Jennifer also told Van Ravenswaay that Wallace went to Smith's apartment in order to retrieve her personal belongings; (9) when the officers initially spoke with Smith and announced their presence as police officers at his door, only Smith responded; (10) although it was now past 8 p.m., Wallace had not responded to the numerous phone calls and text messages sent to her phone since she left the half-way house several hours before.

Smith's first argument against the justification for the officers' entry is that they had no reason to suspect that Wallace was inside Smith's apartment. Docket 53 at 14. According to Smith, Jennifer gave the police shifting and inconsistent information by first suggesting Smith had "found" Wallace during her initial 911 call and then by claiming Wallace had gone to Smith's apartment in order to get her belongings during a subsequent conversation with the police. *Id.* Additionally, Smith asserts the only reason the officers stayed in the area after their initial conversation with Smith was because Sandgren believed Smith to be someone he wasn't. *Id.* at 15.

First, although Sandgren was ultimately mistaken about Smith's identity–a factor that, as Smith contends, would have played into the officers' decision-making process–"[r]easonableness is determined from the perspective of a 'reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " *Samuelson*, 455 F.3d at 875 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). Nothing in the officers' conversations with one another suggested that they ignored their doubts about Smith's resemblance to the man they thought he was. Rather, their conversations revealed that they could not remember what that individual looked like, or his name, and believed Smith's apparent change in appearance was due to drug use. Additionally, as Sandgren remarked after learning of Smith's identity, "You look just like him, similar." Sandgren video at 20:40.

Second, following the officers' discussion with Smith, Sandgren remarked that they were merely "guessing" whether Wallace was in the apartment.

25

Sandgren video at 19:56. Sandgren also expressed his belief that the situation was "kind of borderline." *Id.* at 20:02. The officers then called Jennifer to ask if she had more specific information. Jennifer subsequently explained that she had overheard Wallace and Smith arguing on the phone. Additionally, Jennifer stated that Wallace had gone to Smith's apartment to gather some of her belongings, and that she had not been heard from despite numerous calls and text messages placed to her phone in the interim.

While the police may not have had a great deal of certainty that Wallace was in Smith's apartment, they nonetheless had reason to suspect she may be inside. As the Eighth Circuit has explained, the "reasonable suspicion" standard is less strict than probable cause. *Quezada*, 448 F.3d at 1007. The case cited for the Eighth Circuit's observation, *Maryland v. Buie*, 494 U.S. 325 (1990), applied the "reasonable suspicion" standard from *Terry v. Ohio*, 392 U.S. 1 (1968) regarding the police's use of a protective sweep procedure. *See Maryland*, 494 at 332 ("The ingredients to apply the balance struck in *Terry* and *Long* are present in this case."). The reasonable suspicion standard, as elaborated by the Supreme Court, requires "something more than an 'inchoate and unparticularized suspicion or hunch,' " but is nonetheless "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal citations omitted). Moreover, the totality of the circumstances must be considered in determining whether reasonable suspicion existed. *United States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006). Here, Jennifer feared that Smith was holding Wallace against her

26

will inside Smith's apartment, claimed to have heard the two arguing over the phone, and explained that Wallace's objective of going to Smith's apartment was to get her property. According to Jennifer's original 911 call, Smith and Wallace had a relationship history that could explain why Jennifer kept some of her belongings at his apartment. Before contacting Jennifer again, the officers had also learned that Wallace had not been located in jail, a hospital, detox center, or elsewhere. In light of these circumstances, the officers had reason to suspect Wallace was inside Smith's apartment.

Smith's second contention is that the officers had no reason to suspect that an emergency existed which required their attention. Docket 53 at 14. Smith argues that, even if the officers believed Smith was holding Wallace against her will, that emergency was extinguished once Smith had been arrested. *Id.* Additionally, Smith asserts, the temporary appearance of someone in the window of the apartment during a police call would not suggest anything unusual was happening inside. *Id.*

In support of his argument, Smith argues this court should be guided by *Smith v. Kansas City, Missouri Police Department*, 586 F.3d 576 (8th Cir. 2009). One of the issues presented to the court was whether an officer's "belief that an unarmed domestic violence suspect was inside the home" with a child justified conducting a protective sweep of the house. *Id.* at 580. Finding the facts before it insufficient,[6] the court cited *United States v. Tisdale*, 921 F.2d 1095, 1097

---

[6] The Eighth Circuit noted that the officer "assert[ed] no facts indicating that the suspect was a threat to the child or others." *Smith*, 586 F.3d at 580.

(10th Cir. 1990) for the proposition that "the danger justifying a protective sweep comes from the possible presence of armed and dangerous persons in the vicinity." *Id.* at 581; *see also United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005) (explaining "*Buie* authorizes protective sweeps for unknown individuals in the house who may pose a threat to officers as they effectuate an arrest[.]"). Unlike in *Smith*, however, the officers here did not enter Smith's apartment to look for unknown, dangerous individuals within. Instead, they entered the apartment in response to a perceived emergency facing Wallace. Thus, Smith's reliance on *Smith* is inapposite.

In *Quezada*,[7] by contrast, the Eighth Circuit determined the facts present there–an unlatched door, lights and a television turned on, and no response following police identification–were sufficiently suggestive of an emergency to justify the deputy's entrance into the home. *See Quezada*, 448 F.3d at 1008. Here, the police were called to check the well-being of an individual who missed her half-way house curfew and was purportedly being held against her will. Wallace had allegedly gone to Smith's apartment and had

---

[7] The report and recommendation cites several cases from other circuits that apply the exigent circumstances exception to the warrant requirement. *See* Docket 43 at 7-8 (citing *United States v. Brown*, 64 F.3d 1083 (7th Cir. 1995) and *Martin v. City of Oceanside*, 360 F.3d 1078 (9th Cir. 2004)). Although *Martin* uses the "community caretaking function" language, the court repeatedly refers to its analysis as employing the " 'emergency aid' exception to the warrant requirement[.]" *Martin*, 360 F.3d at 1081. Moreover, these two circuits do not recognize an officer's authority to enter a home pursuant to the community caretaker doctrine. *See United States v. Pichany*, 687 F.2d 204, 209 (7th Cir. 1982); *United States v. Erickson*, 991 F.2d 529, 532 (9th Cir. 1993). While the analysis is somewhat similar, the court will confine its discussion to those cases from the Eighth Circuit that have applied the community caretaker doctrine in similar circumstances.

not been seen or heard from in hours. Police feared, though incorrectly, that the person holding her could be dangerous. Even ignoring the appearance of the curtains moving in the window, the officers had reason to suspect Wallace was inside and were unsure why she had not been replying to calls and text messages or why she missed her curfew. Additionally, because Wallace was not responsive to her friends' attempts to establish contact or to the officers' initial announcement of their presence at the home, those circumstances suggested she may be unable to respond. Although Smith had been arrested, that did not relieve the possibility that Wallace was in some way detained, incapacitated, or otherwise prevented from speaking out or leaving the apartment under her own power. Had the police simply left after arresting Smith, they would have risked leaving Wallace in some unknown condition. The facts in *Quezada* are thus no less suggestive of an emergency than those present here. In that case, as in this case, "a reasonable officer . . . could conclude that someone was inside but was unable to respond for some reason." *Id.* Thus, acting within their community caretaker functions, the officers could reasonably believe Wallace was inside the apartment and facing an emergency that prevented her from leaving. Therefore, the officers' entry was justified.

### iii.    Scope of Intrusion

Finding that the initial intrusion into Smith's apartment was justified by the officers' reasonable suspicion of an emergency facing Wallace within the apartment, this court must assess whether the scope of that intrusion was carefully tailored to satisfy its purpose. *Cf. Harris*, 747 F.3d at 1019. In *Harris*,

29

the initial intrusion was the detention of a person "carelessly handling a firearm in a dangerous and public location that had forbidden firearms[,]" rather than the search of a home. *See id.* at 1018. Under those circumstances, the court considered "the protective measures the police took to ensure their safety and the scope and duration of the intrusion." *Id.* at 1019.

Here, the purpose of entering the apartment was to locate and determine the status of Wallace. By approximately 8:16 p.m., the officers had decided to enter Smith's apartment.[8] At 8:18, they announced their presence at the door and entered, to no immediate response. Within thirty seconds, however, Wallace responded that she was "in the bedroom" of the apartment. Sandgren video at 20:18. The officers began speaking with Wallace shortly after. *Id.* at 20:19. As the officers spoke to Wallace, the firearm at issue in this case was found in the same room. *Id.* at 20:20. According to the officers' testimony, the firearm was located on the bed nearby. Tr. 8:22-25; 35:11-14.

The permissible scope of the officers' intrusion was therefore limited to the bedroom where Wallace indicated she was located. *See, e.g.*, *Michigan v. Clifford*, 464 U.S. 287, 297 (1984) (explaining "As soon as the investigators determined that the fire had originated in the basement and had been caused by [items in the basement], the scope of their search was limited to the

---

[8] Sandgren testified to the apartment's layout as follows: "When you walk in, there is a living room that juts to the left. There's a hallway directly in front, a bathroom on the right-hand side, closet on the right-hand side. There's two bedroom doors on your left in the hallway. When you pass the bedroom doors and the bathroom, there's a small kitchen area and I guess like a smaller dining-type, like a small section off the kitchen."

basement area."); *United States v. Rohrig*, 98 F.3d 1506, 1523 (6th Cir. 1996) (noting "nothing in the record before us suggests that the officers' entry exceeded [the] narrow purpose . . . of ascertaining the source of the loud music and quelling it."). Smith does not argue that the officers ventured beyond the room itself where Wallace and the firearm were located.[9] That the firearm happened to be in that same bedroom as well does not suggest that the officers exceeded the scope of their investigation by noticing that it was laying on the bed nearby. Because the officers were lawfully on the premises, the officers were also permitted to seize the firearm, and its admissibility falls within the plain view doctrine. *Quezada*, 448 F.3d at 1008; *Nord*, 586 F.2d 1289-90. Consequently, the court denies Smith's motion to suppress the firearm found within his residence.

### B.    Inevitable Discovery

At the evidentiary hearing, the government argued for the first time that the firearm would be admissible under the inevitable discovery doctrine if the court concluded the community caretaker doctrine was not satisfied. Although the report and recommendation found that the officers were justified in

---

[9] Smith's argument is confined to the contention that the police should not have entered the apartment in the first instance. *See, e.g.*, Docket 53 at 13-17. Notably, although both Wallace and the firearm were located within a short time, the officers stayed on the scene until 9:36 p.m. *See* Sandgren video at 21:36. The video evidence from all three officers consists of a dashboard camera pointed down the street during all of the events at issue here. Although their wireless microphones picked up the officers' conversations with Wallace, Smith, and each other during this time, it is unclear where the officers were carrying out these activities, and it was not discussed at the evidentiary hearing.

entering Smith's apartment under the community caretaker doctrine, the magistrate judge also found that the inevitable discovery doctrine would have applied in the alterative. The report and recommendation concluded that subsequent information received by the officers would have ultimately justified their decision to enter the apartment, and the firearm would have inevitably been found. Docket 43 at 9-10. Smith contends that, because Wallace was free to leave and no alternative line of investigation was being pursued, the discovery of the weapon inside the apartment was not inevitable. Docket 53 at 18.

The Eighth Circuit has explained that the inevitable discovery doctrine provides "that if the prosecution can establish by a preponderance of the evidence that the information, otherwise to be suppressed under the exclusionary rule, ultimately or inevitably would have been discovered by lawful means, then the exclusionary rule does not apply." *United States v. James*, 353 F.3d 606, 616-17 (8th Cir. 2003) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). The government must therefore show that: "(1) there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *Id.* at 617 (citing *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). With respect to the first prong, there must be "specific details to support a conclusion that discovery was reasonably probable." *United States v. Villalba-Alvarado*, 345 F.3d 1007, 1020 (8th Cir.

2003). Regarding the second prong, the government must show "that there was, at the time of the [unlawful search], an actual other investigation that would have led to discovery of the otherwise unconstitutionally obtained evidence." *James*, 353 F.3d at 617 (8th Cir. 2003).

After the officers decided to enter Smith's apartment, they observed an individual quickly look through a window. Winninger testified that although she was able to see a person in the window, she was unable to identify the individual as male or female. Tr. 46:24-25; 47:1. The officers entered Smith's apartment at 8:18 p.m. Around 8:28, after Alexis had been located, dispatch radioed in that a second 911 call had been placed by Jennifer. In that call, Jennifer stated that Wallace had sent a text message asserting that Smith would not let her leave his apartment.

The report and recommendation theorizes that had the officers not entered the apartment when they did, their justification for doing so would have been even greater after receiving word of the second 911 call. Docket 43 at 10. If Wallace had not yet left the apartment, the officers could have entered pursuant to their community caretaking functions because there would have been more of a reason to believe she was inside but unable to leave under her own power. *Id.* If Wallace had left before the officers entered, however, the officers would have had probable cause to get a warrant and search for evidence within the home. *Id.* Under either scenario, the report and recommendation concluded, the officers would have found the gun in the bedroom. *Id.*

33

The report and recommendation's analysis, however, does not appear to examine the Eighth Circuit's second prong of the inevitable discovery doctrine. Specifically, it does not address whether the officers were "actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *See James*, 353 F.3d at 617. Rather, the report and recommendation posits that the government could have pursued alternative forms of investigation, such as obtaining a warrant and entering the apartment, *after* receiving the information provided in the second 911 call. As the Eighth Circuit has explained, however, the government must show an actual, alternative investigation was already underway at the time of the unlawful search. *Id; see also United States v. Thomas*, 524 F.3d 855, 857-58 (8th Cir. 2008); *United States v. Hammons*, 152 F.3d 1025, 1030 (8th Cir. 1998).

In *Thomas*, for example, officers were looking for a murder suspect named Markell Lane, and they stopped a man who appeared to match his description in order to determine his identity. The man, whose real name was Craig Thomas, told the officers his name was Donnell Thomas and that he lived in an affluent Chicago neighborhood, but that he did not have any identifying documents on him. *Thomas*,  524 F.3d at 857. As it turned out, Donnell was the name of Craig's brother. Thomas nonetheless told the officers that "his brother, Craig Thomas, also lived in Chicago." *Id.* When the officers did not believe him, they attempted to determine his true identity. *Id.* One officer reached into Thomas's pocket and found a bus ticket issued to "Thomas, C." *Id.* Other officers ran a search on Craig and Donnell's names, and they found that

34

the man they stopped did not match Donnell's description. *Id.* at 857-58. Additionally, they discovered that a warrant had been issued for Craig's arrest. *Id.* at 858. Thomas was subsequently arrested and searched, and the search revealed a large quantity of cocaine in Thomas's possession.

The Eighth Circuit determined that the initial search of Thomas's pocket, which revealed the bus ticket issued to "Thomas C.," was constitutionally improper. Nonetheless, the court concluded that the discovery of the evidence on the ticket–Thomas's real name–was inevitable. *Id.* Before the impermissible search occurred, Thomas had provided the officers with two names, Craig and Donnell. Additionally, the officers were already engaged in a "substantial, alterative line of investigation" of determining whether the man they stopped was a murder suspect named Markell Lane. *Id.* Consequently, the officers would have kept Thomas detained until they were able to determine his true identity, and they were investigating the two names he had provided. *Id.* Thus, the discovery of his name on the bus ticket did not require suppression.

Here, by contrast, the officers were not engaged in any substantial, alternative line of investigation at the time of their entry into Smith's home that would have led to the discovery of the firearm. The only investigation taking place was to determine the well-being of Wallace. Although the officers believed Smith was the same individual that the police department had had previous contact with, there is no evidence that the police department was conducting an ongoing investigation of that individual. Additionally, while the circumstances of Wallace's disappearance suggested the possibility of a

35

kidnapping, there is no evidence that the officers were investigating Smith for that purpose. Moreover, although Smith did have an outstanding warrant for his arrest pertaining to unrelated traffic offenses, Smith had already been arrested for those offenses and there is no evidence that suggests an investigation into the traffic offenses would have led to the discovery of the firearm in his apartment. Thus, because there is "no evidence at all of any then-existing alternative investigation," the government has failed to satisfy the second prong of the inevitable discovery doctrine. *See James*, 353 F.3d at 617.

## CONCLUSION

The court finds that the officers entered Smith's apartment pursuant to their community caretaking functions. Additionally, because the officers were lawfully on the premises, the court concludes that the firearm found in the bedroom with Wallace is admissible under the plain view doctrine. The evidence discovered would not, however, be admissible against Smith under the inevitable discovery doctrine. Accordingly, it is

ORDERED the report and recommendation is accepted in part and rejected in part, and the motion to suppress is denied consistent with this opinion.

Dated November 13, 2014.

BY THE COURT:

*/s/Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

36